May it please the Court, my name is Jessica Snyder and I represent the appellate Robert Jesenik. With the Court's permission, I would like to reserve two minutes of my time for rebuttal. This appeal involves six errors, which individually justify reversal, but when viewed collectively, they demonstrate a fundamental imbalance at trial. While the government was allowed to pursue invalid and expansive theories of fraud, the District Court's evidentiary and instructional rulings repeatedly undermined and restricted the defense. By restricting cross-examination of a key witness, admonishing the jury that proper cross-examination amounted to victim blaming, instructing the jury that it's not a defense to fraud that an investor disregarded truthful disclosures, denying defense instructions relating to reliance of accountants in counsel, allowing prejudicial lay and expert testimony about Ponzi schemes and badges of fraud, and refusing to sever the case when co-defendants' counsel actively pursued an antagonistic defense that hinged on securing Mr. Jesenik's conviction. Mr. Snyder, are you going to try to take on those all in your remaining seven minutes or have you divided up the issues? I was going to address the issues in the order they appear in our brief unless the Court would like to address any issue in particular. So starting with the improper theory of fraud, first as to the invalid theories of prosecution, I want to start by emphasizing that this is not presented to the Court as a sufficiency of the evidence claim but as an invalid legal theory. If this Court agrees that any of the government's theories were invalid under the Wire Fraud Statute as that statute has been repeatedly narrowed by the Supreme Court, then because of the general verdict returned here, reversal is required unless the Court can find beyond a reasonable doubt that the jury would have convicted absent those improper theories. Both of the improper theories, if allowed, would criminalize a wide range of regular commercial conduct. The first government theory that was improper, the thinly disguised half-truth theory relating to Equitas' financial health, would allow a vague promotional statement to create an affirmative duty to disclose a wide swath of negative financial information absent a fiduciary duty. What's missing from the government's theory is a connection between the omitted information and what makes that affirmative statement misleading. If the Wire Fraud Statute encompasses this level of disconnect between an optimistic sales pitch, something like... You know, let's talk about that. I don't really, if you're sort of saying this is a puffery sort of sales pitch thing, if I look at the tear sheets, they're pretty specific about how the proceeds from the private notes are going to be used to be purchasing receivables. If I look at the private placement memorandums, I think the from-time-to-time language is arguably misleading here. They certainly don't disclose that, you know, virtually 90% of the time those private notes proceeds is going to be used for operating expenses. Yes, Your Honor, there were multiple theories of fraud pursued in this case, and some of them were valid theories. The theories that were not valid was the half-truth relating to the statement, Equitas is doing great. The government tied this broad, vague promotional statement, Equitas is doing great, and said that it mandated that Equitas disclose basically all negative financial information. And the Wire Fraud Statute, as the Supreme Court has interpreted it in the... Let's look at the Income Opportunity Fund 2 private placement memorandum. It doesn't have any qualifiers about how the note funds are going to be used. Your Honor, that... Your Honor, that allegation in the government's brief, we addressed it in our reply brief, and I'll find the citation to the record, but testimony at trial actually was in... contradicted what the government stated in that brief. The fund manager of that fund said that that language of that PPM allowed them to use the money to redeem investors when it went through other entities. And that was... Okay. Then what about the operating expenses? It says they're all going to be paid by the manager. And, Your Honor, I, I, I, the factual assertions are addressed in our reply brief, but what I want to focus on as it relates to an improper theory is that it doesn't matter if we are alleging one of the theories or two of the theories at trial were improper. It doesn't matter that there were other theories that may have been proper. Perhaps this is a contested fact that was something that was a, we mounted a strong defense to at trial, but supporting a proper theory of fraud, if there were actual lies or misrepresentations in the material, we're not raising, saying that those were not proper theories. We're saying that there were two theories that were... Well, I guess the question of whether the jury would convict absent any of the invalid legal theories, I'm, I'm looking at the, uh, September 2nd, 2015 email of the general counsel, Bob Holman, where he says he raised the negative equity issue with Bob Jesnick and that this may be a Ponzi scheme. You know, I'm looking at the email of September 18th, 2015 from Brian Oliver, uh, to Bob Jesnick talking about how we're going to be 6.55 million dollars cash negative at the end of the month, but, you know, we're assuming the Luxembourg fundraising will bring in 6.44 million. Like, I, tell me why a jury looking at these emails would have come up with a different verdict. Your Honor, there was a, and, and the government must prove harmlessness beyond a reasonable doubt if this court finds that either of their theories were invalid. But here, every one of the fraud allegations made at trial were subject to a very strong defense. Some of the, the allegations that were put into the marketing materials and the, which was one allegation of fraud, and allegations about what were put into the disclosure materials were drafted by counsel and accountants. And this is part of why there were multiple defenses presented at trial, but it was a hotly contested issue at trial, whether or not there was a reliance on counsel and accountants for those statements. And while counsel... Okay, let's not talk about the, the private placement, Maren, let's look at the, um, testimony of, uh, investor Zamarripa. He said, I specifically asked if Equitas ever used the private note money, the investor money, to pay off interest payments to investors, and Bob Jesnick specifically said no. Your Honor, I'm glad that you turned to that issue because Mr. Zamarripa's testimony contained bold contradictions with other evidence in the record. And I think the most obvious example of that is Brian Oliver's testimony. That can be found at 9 Rice ER, 1404 through 05, when Mr. Oliver testified that he never told an investor that all of the, their money would be used for consumer receivables, and he never observed Bob Jesnick tell an investor that all of their money would be received. Well, that's an investor telling you that I point blank asked Mr. Jesnick the question, he said no. And his testimony was contradicted, and there's many reasons why Mr. Zamarripa's cross-examination was so important, and I'd like to briefly touch on that issue about the restriction on his cross-examination and how harmful that was, Your Honor. Cross-examination, his cross-examination was really important for his credibility because he was the only witness who said I was directly told that all of my money would be used for purchasing receivables when I asked that question. And that was inconsistent with the disclosure documents, with the subscription agreement he signed and attested he had reviewed, and with Brian Oliver, the kind of star government witness's testimony. And cross-examination is important not just because it gets in the facts. We had documents in this trial that showed kind of the cold, hard facts of these admitted exhibits, but it's important because witness demeanor changes when they're confronted with conflicting evidence. This witness might have squirmed when he was, when he was pushed on these conflicts in his testimony. He might have rolled his eyes. He might have changed his story. But all of, and all of this is part. Right, but the jury made that credibility determination. They convicted your client, right? They did after. They saw all of the witnesses in this six-week trial, and they made their own credibility determinations as to all of these witnesses, correct? Your Honor, they did after cross-examination was restricted in a pretty dramatic way, when the defense was trying to do what is their core constitutionally protected right and cross-examine him and prove that he wasn't credible. And Mr. Zamm and Ripa's testimony contained, like, contradictions that on their face were highly unusual, and confronting him with those contradictions was critical to proving Mr. Jesnick's defense. He said that he was never told his note was subordinated debt. When it says subordinated debt on the title of the document that he received on the front cover of the document he signed, he said that 100 percent of, he was told 100 percent of his money would go to conservative receivables when Brian Oliver testified in direct conflict with this. This is Brian Oliver, a star government witness. Then to add to the harm, the district court signaled to the jury repeatedly that this line of questioning that he sua sponte, cut off and restricted, and kind of signaled the government to object to it. Let me ask you, would Mr. Rice's acquittal necessitate a conviction of Mr. Jesnick? Your Honor, in terms of severance, if the jury accepted Mr. Rice's core defense, which was that Mr. Jesnick lied to investors and lied to Mr. Rice alike, if the jury accepted his core defense, then they could not acquit Mr. Jesnick. And this is an extreme example of antagonistic defenses that undermine Mr. Jesnick's right to a fair trial. Mr. Rice's counsel promised that he would be, quote, forced to act as a second prosecutor at trial, focused necessarily on securing Mr. Jesnick's conviction, and that was not an empty threat. In opening statement, he said that he aligned himself with the government and said that what the government said is true about Mr. Jesnick, and he called him a liar ten times in his opening statement. In closing argument, he repeated this theme, said that Mr. Rice was on the receiving end of nearly everything the government said happened at this company. And Mr. Jesnick had a rebuttal. That's right, Your Honor, but that doesn't solve the harm of six weeks of trial where sitting at defense counsel there's a second prosecutor creating a def — creating a conflict between every defense that's raised. Where do you get that rule? As I read the cases you've cited, we're talking about whether the defenses are really mutually exclusive. These defenses were mutually exclusive, Your Honor, and two-directional antagonism is not required. It's a logical matter that it was mutually exclusive, that a fraud occurred. It could have been committed by both together. It could have been committed by one. I mean, the cases you cite involve only one culpable act or piece of evidence. This drug — these drugs either belong to you or you. Either you or you stabbed this person. They couldn't both do it. But in this case, one, the other, or both, or neither could have done it. Why doesn't that eliminate this theory? Your Honor, yes, there's two points that I think respond to your question. The first is that we look at what the core defense was, not what some other defenses could have been. There could be other defenses that were raised, but Mr. Rice's core defense was that Mr. Jesnick was guilty of fraud against the investors and against Mr. Rice himself. And that's what they say in Mayfield. They talk about the government's other kind of theories about what could have happened that could have made some third-part person culpable for this, or other defenses that could have been raised that meant neither of them were guilty. But we look to the core of the defense in this case, and that's what is the problem. Mayfield also emphasizes that two-directional antagonism isn't required. You don't have to have two defendants on a desert island with a closed universe around it. In fact, in Mayfield, what they had was one defendant who alleged she wasn't there and the other defendant who said... You're two minutes, two and a half minutes over your time. Let me just make sure. Do you want to hear more? Okay. You're two and a half minutes over your time. I'll think about giving you one minute for rebuttal. Thank you, Your Honor. Good morning. Good morning. May it please the Court. Anna Estevao for Defendant Appellant Andrew McRitchie. I'd like to reserve three minutes for rebuttal. And, Your Honors, I intend to focus on the district court's error in refusing to instruct on the advice of counsel and accountants and the insufficiency of the good faith instruction. This error went to the heart of Mr. McRitchie's principal defense at trial and was profoundly prejudicial. What was the advice of counsel that Mr. McRitchie followed? He followed advice of counsel in several respects. So the government's allegations with respect to Mr. McRitchie in particular, because he was not present for in-person oral solicitations of the private note, were focused on the actual transaction documents, the PPMs, and the marketing statements, and the Lux Fund. So I can turn to each of those individually. With respect to the PPMs, there was substantial evidence that at the very beginning of the indictment period, even prior to the indictment period, there was extensive evidence that attorneys drafted the PPMs with full knowledge of the use of proceeds. But let's look at Mr. McRitchie's edits to the PPM, August 16, 2015, on the from time to time the company may use proceeds of the sale of secured notes to repay the principal in interest of previously issued secured notes. He writes in the comment bubble, why qualify? We do this all the time, and there shouldn't be a problem to investors of us doing so. So he was clearly aware that that statement was not true, correct? Well, with respect to that period of time when he made that comment, that was in August of 2015 and shortly after there were financial reports that significantly changed everyone's outlook as to the finances of the company. What Brian Oliver, the cooperating witness, called a watershed moment. And that comment is actually great evidence of Mr. McRitchie being fully forthcoming with counsel and telling counsel that this is how the use of proceeds are being used. Well, then let's go to his September 5, 2015 email to Brian Oliver. I agree on the critical nature of our situation. To be honest, though, we have been heading towards this point for a couple of years, spending money we don't have, addicted to the private note investments. We are heading for a big train wreck. You know, this is in response to, you know, Mr. Oliver saying, you know, we're falling into it. We, let's see, he says that we fall into a false sense of security that we are bringing in some accounting manner, quote, making money, end quote, when we are in fact burning cash at an alarming pace. Yes, Your Honor, and at that point in September 2015, General Counsel Holman, as well as other attorneys, were, had fully taken the reins with full knowledge as to every aspect of the company and the use of proceeds. And Mr. McRitchie followed counsel's advice with respect to every action that he took. And to the extent that email was discussing Mr. McRitchie's serious concerns about the financial state of the company following the watershed moment that Brian Oliver discussed, and it reflects his, his reflection. You know, you said that Mr. McRitchie was only involved in the written materials and that he didn't do any pitches, but he's the one that pitched LuxBond, right? Around this time frame, summer 2015, August 2015, correct? And again, with respect to his conduct in that respect, it was fully with the advice of counsel. Okay, let's talk about counsel. If I look at Mr. Rudum's testimony, he says he never communicated that, okay, I'll just read it, it's ER 6107, that, you know, he, he, he said he didn't trust his clients, end quote, I can't continue to represent them and I won't. Question, how did you communicate to the client that you didn't trust the answers they were giving you? Answer, I resigned. Did you do anything other than resign to communicate your lack of trust? Answer, I don't believe I did. So Mr. Rudum's testimony was with respect to, it wasn't with respect to the LuxBond, so I can address those two issues separately. And Mr. Rudum was called as a rebuttal witness after Mr. McRitchie testified in his own defense as to his good faith reliance on counsel. And so the fact that the government put Mr. Rudum and Mr. Norris, who was at Sidley Austin and advised with respect to the LuxBond into its rebuttal case, just goes to show that there was some evidence in the record to support an advice of counsel instruction. So what advice of Mr. Rudum did Mr. McRitchie rely on that was not communicated by Mr. Rudum? Mr. Rudum was one of the attorneys involved in the initial drafting of the 2013 PPM. This was back when several attorneys, including Mr. Rudum, a Perkins Cooley lawyer, and Andy Craig, another member of the general counsel's office, all discussed the use of proceeds. And the Perkins Cooley lawyer even said the use of proceeds resembles Ponzi payments. And I don't know the legal implications of informing investors that that's what you're doing with your money. All of the lawyers were having this internal discussion. And based on that discussion, drafted the 2013 PPM. Mr. Rudum drafted that 2013 PPM. So in his testimony, he was discussing his ultimate decision to resign in September or October of 2015. And when he did resign, he didn't tell Mr. McRitchie or anyone else at the company why he was resigning. In fact, he said something to the effect of, it looks like you need other counsel or more experienced counsel for this kind of thing. So Mr. Rudum's testimony in the government's rebuttal case in order to rebut Mr. McRitchie's testimony was fiercely contested. And this goes to the issue of whether or not there was some evidence sufficient to justify the instruction. And, of course, this Court's precedent is that even if that evidence is doubtful, weak, or otherwise contested, as long as there's some foundation in the evidence, then it is justified. But the district court did provide a good-faith defense exception, and this is a variety of that. You didn't get the exact advice of counsel, but the jury was aware that they could acquit if he was acting in good faith. But the good-faith instruction that the Court gave was very different from the instruction approved by this Court in Bush. The instruction here was just with respect to a good-faith belief in the truth of the specific misstatements alleged. And that was not a... Why don't we compare those two instructions? So, you know, the Bush decision does say that the advice of counsel instruction is subsumed within the good-faith instruction. And in Bush, they said good faith is a complete defense to each count because good faith is inconsistent with an attempt to defraud. Good faith means a belief or opinion honestly held without an intent to mislead. And Judge Simon instructed, jury instruction number 20, you may determine whether a defendant had an honest good-faith belief in the truth of the specific alleged misrepresentations in deciding whether that defendant acted with an intent to defraud. If you find the defendant had such an honest good-faith belief, the necessary intent to defraud did not exist. I don't really see those as materially different. Well, in Bush, Your Honor, it encompassed a belief or opinion honestly held without an intent to mislead. And that would cover Mr. McRitchie's defense if the court had given that instruction that Bush gave, because that is not limited to only a good-faith belief in the truth of a specific misrepresentation. That wasn't Mr. McRitchie's defense that he made a misstatement but actually believed that it was true. And so the jury was given no understanding that it could accept Mr. McRitchie's defense. And in fact, it was even more prejudicial in light of the other instruction that the court gave, that ignorance of the law is not a defense, and the government's misleading argument that the fact that a lawyer or accountant could have stopped them is not a defense. And so the jury hearing all of those instructions without a Bush-like instruction about a belief or opinion honestly held could not have properly evaluated all the evidence that Mr. McRitchie put forth and his testimony that he relied in good faith. Do you have any more? Okay. I'll reserve my time. You have a minute and 12 seconds left. I'll reserve my time. Thank you. Okay. Thank you. Good morning, Your Honors. Angelo Calfo on behalf of appellant Brian Rice. Your Honors, our position is that the trial court's errors individually or combined deprived our client of a fair trial. And the errors that occurred at trial in our view are unique. You had a unique impact on Mr. Rice, different than the other defendants in the case because of the facts relating to his alleged participation in this company. And I think maybe the most poignant fact that came out at trial was during the testimony of the government's primary witness, Brian Oliver. He testified that in the months before the company collapsed, he was lying to Mr. Rice about whether these investments should continue to be sold. And he said he lied to Mr. Rice because he wanted to keep fundraising going. I mean, that's coming from the government's own witness. And I think that sort of, you know, we look at the larger context here, our theory at trial, which I think the government conceded, frankly, was that our client came into this organization on false pretenses. They lied to him about it. And then they lied to him while he was there. And so this was, you know, very unique because he wasn't involved, for example, in creating the PPMs, in creating the tear sheets. And in fact, during the last year that he was there, what he did was when the government's witness Bob Holman, the company's general counsel, came in and started saying, hey, there are problems here. He worked with Mr. Holman to revise the PPMs, to revise the tear sheets, to change the way they were doing business. And in fact, Mr. Holman testified that Mr. Rice was solidly supportive of changes to the investor communications to make them in line with the company's business. I mean, that's pretty unique compared to the evidence that was presented against the other defendants. So let me ask you about, so there's an email from Nasser Abu Shaban, September 28, 2015, which says we need to close $8.5 million in fundraising to meet all the obligations for the week. And Mr. Rice responds to that the next day saying, I'll let Brian Oliver comment on notes, but I have an additional $3 million in 90-day private note money we should see from PAG. So he's still out there hustling for more investors knowing where that money is going. And in third quarter of 2015, to investor Brian, or I guess, I don't know, I think his name is Chris Bean, Mr. Rice called, let him know there's a very time-sensitive investment opportunity. They needed to raise the funds to execute on and said that they were urgently looking for cash and were willing to pay a slightly higher yield for a 90-day note. So Mr. Rice is still out there giving that sales pitch, trying to bring money and knowing exactly where that money is going to go, right?  Absolutely. I mean, the company had a very serious liquidity problem. That was something everybody in the company knew, and that's what the investment advisors also knew. And this is the other difference, Your Honor, when you're looking at those things. For example, you mentioned a September 2015 email. That was the very same month that Mr. Oliver testified, Your Honor, that he was lying to Brian Rice about the investment. Well, let's look at Mr. Sika's testimony. Did you ever tell Mr. Rice that you had suspicions that you thought Equitas was a Ponzi scheme? Answer, yes. What was his response to that? He denied it. Well, Your Honor, this is the thing about Mr. Sika. Did Mr. Rice ever tell you about an SEC investigation into Equitas? Equitas? Answer, no. Did Mr. Rice ever tell you about liquidity problems, long-term liquidity problems at Equitas? Answer, no. Well, Your Honor, I think you can take, obviously, our position is, for example, that, you know, the harmless error standard here is beyond a reasonable doubt. So I'm not saying there wasn't sufficient evidence for the government to present the case. What I'm saying is that if we had the opportunity to fully defend, we could have won. And not just—this is a case where the government can't sustain its burden. Now, on those particular ones, now, Mr. Sika was one of four investment advisors that Mr. Rice interacted with. You mentioned Mr. Zamarepa, for example. He had no contact with these individual investors. Mr. Rice didn't. Only with these investment advisors. And if you look at the cross-examinations of each, Your Honor, I think you'll see that, you know, the testimony was highly questionable. For example, Mr. Sika said he didn't know about the SEC investigation, but there was evidence we presented during his cross that he did. He claimed that he didn't know that the company was using new investor money to pay prior investors. He had testified in an SEC investigation that he knew that. Let's take Mr. Bean, for example. He testified at the government's request about how Mr. Rice said this about Equitas and that about Equitas. Did you see his cross-examination where he said, Your Honors, he said, I don't remember if we talked about Equitas at all. And when it came to Ms. Ranasi, the same issue came—you know, same kinds of credibility issues. And, Your Honor, this ties in to instruction number 19. Because if you look at what Mr. Rice was convicted of, according to the government's theory, it was his interactions with these investment advisors. And instruction number 19 told the jury, it's no defense. It is not a defense to mail-or-wire fraud if an investor, an investment advisor, intentionally ignored information that was available to them. But that goes to materiality, does it not? Well, it should, Your Honors. But I'm sure you, in my reply brief, you saw two things. One, I raised this with the district court, that you should limit this to materiality. And he said, well, yeah, that's what Lindsey sort of says, but no. And then the government argued, no, Your Honor, it goes to culpability generally. Well, the government can make its argument, but the district court's instruction, and it was a little surprised, given the presentation and the briefs, to find that there's really no other way to read this, that this comes under the heading of materiality, does it not? Well, Your Honor, I think we may be giving the jury too much credit to say that it comes under that heading, and therefore, it couldn't be read as something else. Because it says it is not a defense to mail-or-wire fraud. It could have been very, and I asked the judge, Your Honor, could you just add at the end, I asked, it's in the record, could you just add as to materiality? And he said, yes, technically, that's what Lindsey says, but I'm not going to change it. And then when you go to closing argument, Your Honor, the government's arguing you can't disclose your way out of fraud. They're telling the jury that any argument that the investment advisors had information that contradicted the claims of omission by my client. That was a witness who said you can't disclose your way out of fraud. And the government repeated it. How often? Pardon? In rebuttal, Your Honor. Uh-huh. And quoting that witness? And citing that witness? Well, Your Honor, I think they argued it as part of this instruction. And so did the, in opening, the prosecutor specifically said, with respect to number 19, that it related to whether or not there was a false statement. Not just materiality. So it was argued differently, Your Honor, and it was understood by the court, it was understood by the prosecutors differently. And when the jury got back there and they're told it's no defense to mail or wire fraud if the investor deliberately ignores information, then that's what they're going to, that's how they're going to decide the case. And it was very insidious here, Your Honor, because if you read the closing arguments of the government, especially in rebuttal, it's that Mr. Rice didn't disclose this. He didn't disclose that. He didn't disclose the other thing. And it had to be essential to our defense to be able to explain what information, what disclosures the investor, the investment advisor had, what other information he had. Are you contending that there appears to be quite a volume of evidence in terms of the disclosures that were made? What was missing? What documents in terms of the disclosures presented over this trial weeks and weeks were missing that would have made a difference? Well, Your Honor, I think it wasn't so much a problem with the evidence being there. It's that when the jury went back and analyzed the evidence, they would say, for example, if Mr. Rice, if somebody said, well, Mr. Rice lied to me because he didn't tell me about the SEC investigation. And then there was evidence that that investment advisor knew about the SEC investigation or had information available to him and he ignored it. Mr. Rice can be convicted under this instruction because the investor ignored information that was readily available that would have made the half-truth, quote, unquote, accurate. And that's where it really gets to be a problem. Your Honor, I would like to reserve a minute for rebuttal. Yes. You have 30 seconds left, but I'll give everybody a minute for rebuttal.  Good morning, and may it please the Court. I'm Hannah Horsley on behalf of the United States. I'm going to focus primarily on responding to the specific arguments raised this morning. And, of course, we'll answer the Court's questions on anything else. First, with respect to Mr. Jesnick's allegation that the government presented an invalid theory of fraud is simply not true on this record. The government pursued one legal theory of fraud, and there were multiple means or factual ways in which the fraud was perpetrated, the types of misrepresentations made. That does not make this a legal theory of fraud that could somehow be found invalid. Is it true under your theory that you can, in fact, disclose your way out of fraud? Yes. Okay. But, and yet, the government ran with that quote from a witness again and again. Your Honor, I think it's clear when you look at the totality of the closing arguments that that was not, the government did not run with that theory. But you did repeat it, and you're agreeing that that statement's not correct. Well, it was repeated in the context, again, of quoting from the testimony of a particular witness. And then there are all these other. But not for the purposes of establishing what that testimony established. It was a pull quote and kind of a slogan that was wielded by the prosecution. It was a slogan, and it was really, in substance, an argument that they did not disclose their way out of fraud. That these PPMs, this financial statement, didn't actually provide the kind of critical, qualifying information or the complete truth that would have meant full disclosure. Well, but a lot of these statements were true, right, for much of the time. Some of these private note monies were only used from time to time. Not during the time period charged in the conspiracy. The testimony of Brian Oliver was that the vast bulk of the money was not used for those purposes during the course of the conspiracy. But that means that for some portion of the money, it was used appropriately in the manner disclosed to investors. But the point is, as the court noted earlier, the tear sheets are really what are saying the primary use of the money is going to be, which is, you know, to buy income-producing receivables. The PPM doesn't do anything to correct that. It's not the full disclosure of critical, qualifying information to just say, from time to time, we may use it to pay back other investors for redemptions. That's not a full correction to all of the oral pitches and all of those tear sheets that they were sending out quarter after quarter, saying we're primarily using your money to purchase receivables. So it didn't complete, it didn't correct the problem. And I want to point the court to other parts of the record where, in closing argument, we referenced the PPMs, we referenced the financial statement, the audited financial statement, and made clear that they were in evidence. And the government argued, you know, with respect to IOF2 PPM, you can read it for yourself. But you didn't, by stopping all of the testimony from these RIAs, I mean, they had an incentive, perhaps, to not be fully honest, right? Because they should have performed more due diligence before getting their clients to make these investments. So by stopping the cross-examination into these RIAs to really get at whether they were being truthful or not, you undermine the defendant's ability to really challenge their credibility, didn't you? And that is not what happened. There was one witness, Bob Zamarippa, who was not an RIA, whose testimony during cross-examination was curtailed. And as the court made clear at the time, that was only because he had not read the PPM in detail. So the court made a relevancy determination that for that one witness, you couldn't dig into the details of the PPM because he testified he hadn't read it. All of the RIA witnesses, all four of the RIA witnesses, as well as two other witnesses, were questioned about the PPM. But why couldn't that be relevant to intent to defraud, right? He had the information available. Had he bothered to read it, he may not have invested. As this court has long made clear following Nieder in Peterson, even before that in Ciccone, and again in Lindsey, the victim's conduct, whether they read the materials, whether they understood the materials, what they did with the materials, is irrelevant. We're looking at the intent of the defendants in determining whether they had a good faith belief what they were saying was true, not how it landed with the victim. So the victim's state of mind or negligence or... Well, their credibility is very key here because a lot of your evidence dealt with what were the oral pitches that defendants were making to these RIAs. So hamstringing the defendant's ability to challenge the credibility of the RIAs was crucial, wasn't it? And they were not. The record shows they were not hamstrung. They got to question all of the RIAs about the documents and whether they read them and what they understood them to mean. And if the court looks closely at the jury instruction conference with Judge Simon, this is in Volume 28 of the Rice Excerpts at 6183-93, it's very clear the district court did not in any way restrict their ability to argue this as to either credibility or intent. And in fact, they did. But let me ask you about Brian Oliver's guilty plea. You said at opening argument, before this trial, I'm quoting, before this trial, Brian Oliver stood in a courtroom just like this one and pled guilty to conspiring to defraud investors, the number two of the company. He pled guilty to crimes that all three defendants, his alleged co-conspirators, are charged with. Now, you argue, oh, I only made that statement for Mr. Oliver's credibility. But that strains credulity because this is saying, hey, Brian Oliver did the exact same thing as these three defendants, and he pled guilty, and these three defendants should, too, because they're equally guilty. They did the same thing. So how can you say that that statement in opening is a credibility characterization versus a guilt characterization? Well, the district court properly instructed the jury twice on how they could consider those statements. So if there were any error, it was definitely cured by that instruction. The court made it very clear you may not consider it as evidence against any three of these defendants as to whether they are guilty or whether they lied to investors, so both as to the conduct itself and whether that amounted to a crime. The court clearly precluded the risk that they could consider it improperly. But do you concede that statement may have been improper? I'm sorry? Do you concede that statement may have been improper? No, I'm not conceding that. I think under Halbert and the way it was used and the context in which it was made, it was clear it was commenting on Oliver in order for them to understand that he had a firsthand basis for the knowledge and the testimony he was going to provide. As the government said, he was in the room when it happened, and he's going to peel back the curtain and explain what happened. But doesn't that, I mean, this is quite the bell to unring here. Doesn't that require even more caution, counsel, even more caution on the government's part not to make that the centerpiece of the introduction to its opening? Well, it was not the centerpiece of the opening. I think if you read it in full context, it came up in talking about who was going to be testifying and identifying who these people were in one instance. And government counsel specifically said, it's up to you to decide whether these defendants lied. He didn't in any way say because Mr. Oliver lied, these two must have as well. But I do think the court's instruction there, reviewed for an abuse of discretion, precluded the risk that it was used improperly. If the court has any other questions, I'm happy to answer them. I guess the fraud expert, to have an expert, there is lay testimony from investors about a Ponzi scheme. But to put on an expert who has a method of determining whether fraud occurred and established these badges of fraud, why was that admissible? I think in the context of this case, this is not a super straightforward Ponzi scheme where you're telling somebody— Well, the government didn't think it was a Ponzi scheme at all. That's not how it was charged. Well, it wasn't charged as a Ponzi scheme, but the evidence was that they were taking investor money and using it to pay back prior investors. So you're right, we did not present it as this is a Ponzi scheme. But my point is, to the extent you have an expert witness who's trying to explain why the conduct of this business, why the use of assets, the transfer of assets, the way all the entities operated in relation to each other, how that investor money flowed through the company, it was sufficiently complicated that it was very helpful in this case to have the expert witness be able to testify so that the jury could really understand and help them understand the evidence about how the money was used and that it was, in fact, going to pay back prior investors. It was also, if anything, would have been harmless error because they're not even contesting the testimony of both Vanessa DeHaan and Brian Oliver himself, who both testified this was— that the way they were operating the company was a Ponzi scheme. Do you think it would have been a better practice to revise the jury instruction regarding the Lindsay issue, to say it's not a defense that the RIAs or investors relied on misleading information? Because that is what Lindsay is talking about, right? Well, I mean— Fraudulent information, and the defendants here are more focused on the correct information that's in the private placement memorandum. Yeah. Would that have been the better practice to have qualified the information not relied on? Possibly. Lindsay does use the word relevant information, not truthful information or false information. I think the import here and the part of the Lindsay case that the Court was really trying to make use of is this general victim negligence standard and just adding the specific language that comes up in Lindsay for the first time, that a form of negligence is intentional disregard of information. So it's really using—I mean, just that direct quote from Lindsay is all that got inserted into the instruction. Okay. Thank you, Your Honor. All right. Thank you, Your Honor. I just want to make a few quick record points to respond to some of your questions, and then I would like to hopefully address one issue. The first is that the IOF Fund 2 citation is 12 Rice ER 2123-24. That addresses the government witness testimony that conflicts with the language cited. I also want to emphasize about the materiality instruction that this Court referenced and how it had a heading of materiality. That heading was not read to the jury out loud. If you look at the transcript of the instructions as read to the jury, they did not read any of the headings, and you can see that at 28 Rice ER 6183-93. Did Judge Simon give the jury a hard copy of the instructions? He did, Your Honor. So if it wasn't read out loud, what does it matter? They had a copy and they took that copy into the jury room during deliberations. That they may or may not have reviewed, and this Court's precedent has said that what's read out loud is what governs. I also wanted to point the Court to the language in the rebuttal oral argument where the government really emphasized that the crime is complete and you can't disclose your way out of fraud. That's at Rice ER 6816. He said the crime has been completed and you can't disclose your way out of fraud, meaning you can't use the PPM. Once you've said, we are doing great. For all of these issues, harmlessness is beyond a reasonable, or for many of these issues, beyond a reasonable doubt. And the Yates case looked at, Yates case looked at whether or not it was a close case, a complex record, jury deliberation for four days, and a split verdict. And those are the exact factors that we have here, Your Honor. And I realize I'm past my time. All right, thank you. Thank you, Your Honors. I would just like to, again, reiterate the prejudice of the instructions that the Court gave and the government's argument. And the government's taking advantage of the holes in the instructions and misleading the jury in that regard. The good faith instruction in this case was so narrow as to prevent the jury from considering Mr. McRitchie's defense and didn't cover the advice of counsel defense. And it also didn't cover a truthful disclosure defense. And the government misled the jury in argument by arguing not only you can't disclose your way out of fraud, but also that it's not a defense to point to the truthful disclosures. In addition to their argument about the lawyers and accountants not being, the fact that lawyers and accountants did not, quote unquote, stop them is not a defense. And in this case in particular, the prejudice is exceedingly important because none of, with respect to the marketing materials and the PPMs that were fully drafted by counsel and the marketing materials that were created by the accountants that Mr. McRitchie relied on, and he, unlike Mr. Rice and Mr. Jesnick, was fully reliant on those accountants and the counsel for purposes of those disclosure materials. And with respect to the disclosure defense that he advanced at trial, because he wasn't present during the oral solicitations, it was especially important that he was relying on counsel's advice and the full disclosures in the written materials. Thank you. All right, thank you. Everyone's going over time. I just want to note that for the record. And that's fine. Go ahead, please. Your Honors, well, Your Honor read from one portion of the opening statement that was given relating to Brian Oliver's plea. But what was said before that was there is no dispute in this case that former high-level Equitas executives have already pled guilty for the crimes they have committed. The key issue is whether these defendants lied. And that happened, like, minutes into the opening statement. This wasn't something that was buried in the middle or, well, not a centerpiece. It came right away. And if you look at that language there, there is no tie between the statement relating to the guilty plea and the credibility of any witness. In fact, no witness is even identified. Former high-level executives at the company are going to plead guilty to the same offenses that these individuals here are sitting at. There's only one inference about why that was given. I think the prosecutor was pretty surprised when I stood up and said, hey, wait a second. You know, you can't use it that way. And the judge agreed. But I think you can't unring a bell like that in the first few seconds of an opening statement. That set the tone for the entire case. And it was the first major error that occurred. And then, Your Honors, during my examination of an RIA, not an individual investor, Fariba Aranasi, I was asking her about her use of the PPMs based on some internal documents that she had. She had testified that the tear sheet was the Bible. And while she was, her internal records showed that she had her internal assistants modify the tear sheets, saying they're too scary, and they'll read the PPM anyway. The judge interrupted my examination and said, because he sustained objections, let me explain to you a little bit about why I'm sustaining these objections to the jury. I'll give you more legal instructions later, but under the law of mail and wire fraud, we don't blame the victim. I'm standing up there, Your Honor, asking the quote-unquote victim the question. And the judge is telling the jury we don't blame the victim. Later in that same examination, he stated to the jury, in front of the jury, that your cross is marginally relevant. And, of course, at that point, we had no idea that the judge was going to instruct the jury that even intentionally disregarding this information was no, you know, by the RIAs, was no defense to any of our claims. But isn't that consistent with Lindsay? That it's no defense? Your Honor, I think it's not. Even intentional disregard of relevant information is not a defense. It is when the theory is that there were affirmative misrepresentations made. And in fact, in the courts in the Ninth Circuit's model instructions, it sort of cabinets, Lindsay, in the commentary just to mortgage fraud cases. I don't know why, but that's where it's there. Here you've got a case, and I think this is the really critical distinction. And that is, my client's being told over and over, the jury's being told, he didn't say this, he didn't say this, he didn't say this. And when you give the investment advisor the power to say, I ignored this, this, and this, even if it were to clarify what was not stated, that's the real insidious part of this instruction, is it gives the investor the ability to frame what a half-truth is by ignoring information that was disclosed. Truthful information, not like in Lindsay, where the basic point of Lindsay was, you know, you can't argue that your false statements weren't considered by the bank, and therefore, you're not, you know, guilty. That's a no-brainer, right, Your Honor? But in this case, when you've got truthful disclosures and other information available to the investor that would clarify the alleged omissions, that's where you've got a real problem with the case, and the fairness of the way this went down. Thank you so much, Your Honor. All right. Thank you. Thank you very much. Thank you to all counsel. Very much appreciate your helpful arguments today. Thank you. All right. We are adjourned for today. Thank you.
judges: HURWITZ, KOH, JOHNSTONE